Whitaker, Judge,
delivered the opinion of the court:
This suit arises from a contract under which plaintiff supplied 50 trailer-mounted hi-pressure steam cleaning units to the United States Marine Corps.
Plaintiff contends that it sustained a loss in the amount of $5,868.50, which it claims is the difference in cost of parts and accessories for the units which defendant insisted it provide under the contract, and which it in fact supplied, and what the cost would have been had plaintiff been permitted to manufacture them itself or to purchase them from independent suppliers. It also says that defendant refused to inspect and accept delivery of the first or pilot model of the units it wished to supply, and it claims the unit price of $1,269.88 therefor.
The Marine Corps had immediate need for the trailers in suit in order to supply troops in the field during the Korean War. The contract was negotiated under the authority of section 2 (c) (1) of the Armed Services Procurement Act, 41U. S. C. 151, which allows the Armed Services to procure equipment without the necessity of formal advertising and solicitation of bids when necessary in the public interest in time of national emergency. There is no claim that the contract was made contrary to law.
Plaintiff had previously supplied the Marine Corps with units of the type called for by the contract in suit. In 1950, in submitting a bid on such trailers, they had furnished a drawing and photographs of the completed unit which they intended to supply. Defendant requested and had received permission from plaintiff to use the drawing in soliciting bids for the contract in suit. Invitations to negotiate on the basis of the specifications and the drawing were sent to eighteen prospective bidders, three of whom, including plaintiff, made offers. The specifications and drawing showed the use of Homestead equipment on the trailer.
The specifications on which plaintiff and others were invited to bid called for “the steam generating unit to be oil- *615 fired, gasoline engine powered, Model No. JO (factory modified) , as manufactured by the Homestead Valve Manufacturing Company, Coraopolis, Pennsylvania, of current manufacture, and is to be mounted on tbe trailer chassis between the water supply tanks and in the proximate location shown on the attached drawing.”
In previous contracts the units which defendant desired to procure were described in the identical terms which the instant contract used, except that previous contracts called for a steam generating unit manufactured by Homestead but added the words “or equal”; whereas the present contract eliminated the words “or equal.”
Plaintiff had previously supplied more than 600 such units to the defendant, each of which called for a steam generating unit manufactured by the Homestead Valve Manufacturing Company, and these units had been supplied.
These units were specified since they had been rigorously field tested by the Marines, and had proven suitable for their use, and the parts in the older units were 89 percent interchangeable with the units they were making in 1952.
Inasmuch as previous contracts between plaintiff and defendant had called for a Homestead steam generating plant “or equal,” and since in the instant contract the words “or equal” were eliminated, there can be no doubt that both parties knew or should have known that only the Homestead unit was to be supplied. The so-called accessories were actually component parts of the unit, and when the contract called for a Homestead “steam generating unit,” it meant the complete unit, made up of its different parts. Plaintiff undertook to acquire from Homestead the unit, less its cover, stack, hose, foot valve, and strainer. Since these were integral parts of the unit, Homestead had never quoted plaintiff a price on the unit less these parts.
The contract, in calling for the unit, called for each part thereof, and there was no justification for the attempted substitution for some of the parts. In performing previous contracts, plaintiff had supplied the unit with all its parts.
Even if this contract, like previous ones, had contained the words, “or equal,” plaintiff has not proven that its substitutes for the parts were the equal of the Homestead parts. *616 One of its substitutes was for the suction hose, which of necessity had to be of required strength to keep it from collapsing, thus cutting off the supply of water, without which the unit would not work. Plaintiff sought to get a suction hose from the Home Rubber Company. This company wrote plaintiff that they could not say that the hose it had ordered “would meet your requirements as a suction hose unless we were more familiar with the vacuum and the rate of flow of the pump on the steam jenny.”
There is no merit in plaintiff’s claim of damages for failure to inspect. Defendant justifiably refused to inspect the unit proffered because it knew it contained substituted parts, and defendant wanted no substitutes.
Plaintiff’s claim is without merit. Its petition is dismissed.
It is so ordered.
Laramore, Judge; Madden, Judge; Littleton, Judge; and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Commissioner Paul H. McMurray, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff is a corporation having its principal office at 1995 Pitkin Avenue, Brooklyn 7, New York. This claim involves Contract NOm-62280 dated March 3, 1952, between the plaintiff, Henry Spen Company, Inc., and the United States acting through the Department of the Navy, and the United States Marine Corps. Under the contract the plaintiff agreed to supply the United States Marine Corps 50 trailer-mounted hi-pressure cleaning units at a price of $1,269.88 each, the total contract price being $63,494.00.
2. The steam cleaning unit is used for developing steam under pressure to be used in cleaning equipment under field conditions. The unit must have a source of water supply and the primary source is the storage tank provided on the trailer to which the unit is attached. An additional feature makes it possible to use a pump on the unit to either fill the tank or use water directly from other sources. The unit is open flame heated. When the cleaning operation is begun *617 the burner is ignited, water is passed through the heating coils, generated into steam, passed through a steam hose and then through a steam gun under great pressure. The application of this steam under pressure removes dirt or grease or other accumulations from the equipment that is being cleaned. These units are trailer-mounted and are normally assigned to tactical force units of the United States Marine Corps.
3. The specifications for the unit in question, as well as for units procured in 1950, were developed and written by Mr. Kenneth V. Shane, Technical Administrative Assistant to the Officer in Charge, Motor Transport Supply Section, Supply Department, Headquarters, United States Marine Corps. The specifications were written with the express intent to procure Homestead-type units.
4. Under date of January 24, 1952, the United States Marine Corps sent a letter to plaintiff containing the following statement:
The Marine Corps is interested in procuring fifty (50) steam cleaning trailers. For this purpose we desire to send out reproductions of your drawing No. 116010 of 21 May 1950, which was sent to us together with your bid on Contract NOm-57109. We request your permission to use your drawing for this purpose and also desire to know if you are interested in submitting a quotation on these trailers f. o. b. cars with a delivery date to be set by you.
Two copies of the requested drawing were provided by plaintiff and were transmitted to the Marine Corps by letter dated February 2, 1952. The drawing referred to was submitted to the Marine Corps originally by letter of June 22, 1950, together with photographs of the completed trailer units, when the plaintiff was bidding on an earlier contract. This drawing was of the trailer with cleaning unit installed. The drawing depicts the contour of a Homestead cleaning unit. Photographs furnished at the same time show the trailer with Homestead unit installed.
5. On February 4,1952, the Marine Corps wrote to plaintiff inviting Spen’s quotation on 50 trailers, by not later than February 11,1952. The specifications were enclosed as well as a copy of the drawing previously furnished the *618 Marine Corps by Spen. The attached specifications required “the steam generating unit to be oil-fired, gasoline engine powered, Model No. JO (factory modified), as manufactured by the Homestead Valve Manufacturing Company, Coraopolis, Pennsylvania, of current manufacture, and is to be mounted on the trailer chassis between the water supply tanks and in the proximate location shown on the attached drawing”. At the same time the Marine Corps requested quotations from approximately seventeen other manufacturers.
6. Upon receipt of the invitation to submit quotations the plaintiff proceeded to obtain price quotations from its suppliers on the various components of the unit. On February 8, 1952, the plaintiff wrote a letter to the Homestead Valve Company, reading in pertinent part as follows:
We would like to receive prices on your Jenny, Model #52222-39 incl. 52241-46 inch as per invoice #JV 69714, dated June 30, 1949, priced at $590.01 ea., supplied us previously for mounting on trailers.
These units are to be for the Marine Corps and must be painted in Marine Corps olive green, specification No. T. T-E-489, dated June 13,1947 and amended July 26,1948.
Besides the jenny the units must have the following:
1. One (1) ea. 25 ft. steam hose
2. One (1) ea. 50 inch suction hose with couplings
3. One (1) ea. foot valve
4. One (1) ea. strainer
5. One (1) ea. cleaning gun with two (2) ea. nozzles (one (1) ea. flat and one (1) ea. round).
As I understand, it is to be a negotiated bid and besides ourselves two other outfits should figure.
We hope to receive your best prices on above equipment.
7. Since the Marine Corps had requested Spen to furnish quotations not later than February 11,1952 and a quotation from Homestead to Spen had not arrived in Spen’s office by that date, Seymour Spen, plaintiff’s president, telephoned Homestead in an effort to get the quotation.
On the same day, February 11,1952, the Homestead Valve Manufacturing Company wrote to the Spen Company giving them a quotation of $660.50. Homestead Valve was also one *619 of the bidders on the contract in suit. In its bid to the Marine Corps, it offered a quotation both on the cleaning unit trailer mounted at a price of $1,700.00 each or for the steam cleaning unit separately at a unit price of $660.50.
8. Under date of February 13,1952, Spen sent a telegram to the Headquarters, United States Marine Corps, stating “Propose to furnish 50 ea. steam cleaning units as per print and specification for the sum of $1,290.00 per unit, F. O. B. cars, Brooklyn, N. Y., Henry Spen & Co., Inc.” This telegram was confirmed by letter of February 15,1952, in which plaintiff stated:
In confirmation of our recent telegram we are pleased to submit our quotation for fifty (50) ea. Steam Cleaning trailers in accordance with your specifications and drawings.
This is our formal proposal to supply these units at a unit cost of One thousand two hundred and ninety dollars ($1,290.00), F. O. B. cars, Brooklyn, N. Y. shipped on government bill of lading.
We have manufactured units of this type in the past and trust that we may be favored with your valued order.
Delivery in 90 to 120 days after receipt of contract.
If any further information is required, we are at your service.
Enclosed with this letter were two photographs of the Homestead unit that plaintiff had previously furnished the Marine Corps.
9. Subsequent to the submission of its bid plaintiff received word from its Washington representative, one Herman Fink, that the Marine Corps was interested in shortening the period allowed for delivery to 45 days. A few days after that, Mr. Fink called again and said that Spen was not the low bidder. A later call was received by Spen from Fink, who at the time was in the office of the contracting officer, Col. Bethel, in Washington. Seymour Spen and Col. Bethel had a conversation in which Col. Bethel told Spen that his bid was not the lowest and that if he wanted the contract he would have to lower his bid. Spen agreed to recompute the bid and on the following day a revised price of $1,269.00 was submitted by Spén. The Marine Corps then requested assurance that delivery would run 45 to 65 days, which as *620 surance was given by Spen. Thereafter on February 27, 1952, Spen was given telegraphic notice of the award of the contract to him and subsequently a formal notice to proceed.
10. The formal contract was entered into as of March 3, 1952. Pertinent provisions of the contract include the following :
This negotiated contract is entered into pursuant to the provisions of Section 2 (c) (1) of the Armed Service Procurement Act of 1947 (Public Law 413, 80th Congress), and any required determination and findings have been made.
*****
SPECIFICATIONS FOB TRAILER, 2-WHEEL, STEAM CLEANING
These units, in general, are to be in accordance with the attached drawing.
The steam generating unit to be oil-fired, gasoline engine powered, Model No. JO (Factory modified), as manufactured by the Homestead Valve Manufacturing Company, Coraopolis, Pennsylvania, of current manufacture, and is to be mounted on the trailer chassis between the water supply tanks in the approximate location shown on the attached drawing.
11. Following the award of the contract on the basis of the reduced quotation, Spen attempted to obtain the lowest possible prices from his suppliers. Since previous contracts, awarded on the basis of formal advertising, had included wording identical with the instant contract but also an “or equal” provision, Seymour Spen stated during the course of his testimony that he believed, despite the wording of the contract in suit, that plaintiff was entitled to supply a unit other than the Homestead as if the deleted term “or equal” had been present in the contract specifications. On March 3, 1952, plaintiff contacted representatives of Aeroil Products Company in an effort to obtain a lower price for the cleaning units, and received a quotation from them dated March 4,1952, for fifty steam cleaning units.
In requesting its quotation from Aeroil the plaintiff specified that the unit should be equipped with the Marine Corps modifications which Spen had requested in its letter of *621 February 8, 1952, to Homestead. This included a 50-foot suction hose, foot valve, strainer, and machinery cover.
Spen then ordered one Aeroil unit and proceeded to mount it and test it in an effort to determine whether it would meet Marine Corps specifications.
Plaintiff test-drove this unit for approximately 50 miles. There is no evidence that such a test proves its suitability for the same use as a Homestead unit, nor was any proof offered that such test qualifies it under the specifications.
12. On March 20, 1952, Spen wrote to the Marine Corps stating that a pilot model was ready for inspection. A follow-up telegram was sent on March 31 again requesting inspection and making reference to the previous letter. Monroe Spen, plaintiff’s treasurer, then called Mr. Shane in Washington and was told that the Marine Corps would not test or accept any unit unless it was made by the Homestead Valve Manufacturing Company. As a result of this conversation Spen communicated with Homestead under date of April 3, 1952. The document sent by Spen to Homestead was subsequently referred to by him as a purchase order but it was not in the usual form of a purchase order. Plaintiff had requested the following:
50 ea. Steam generators Model JO factory modified, gasoline engine powered. This to conform with Marine Corps Contract NOm-62280 above equip, to be less machinery cover, stack, 5th wheel & pull rod, 4 wheels less: foot valve and strainer suction hose (50' x 1") with couplings.
However, in the place provided for the price, he wrote the words “advise” and “advise net price”.
13. On April 2, 1952 plaintiff wrote to the Marine Corps in part as follows:
This is to confirm a phone conversation held with Mr. Kenneth Shane of Motor Transport, in reply to our request of March 20, 1952 for an inspection of a trailer unit on above contract.
Mr. Shane verbally advised us that no inspection would.be forthcoming, as in his opinion the steam cleaning unit is not the same as the manufacturers brand called for.
We believe this decision to be arbitrary and not in the best interests of the Government.
*622 14. The Marine Corps telegraphed. Henry Spen on April 4:
Marine Corps not in position to consider any other steam generator under your Contract NOm-62280 than that specified under the specifications and invitation. Your disregard this item necessitates Marine Corps purchase of generators to replace your now prospective delinquency.
The prospective delinquency referred to was due to the fact that no units had been received by plaintiff from Homestead as of April 2, and the Marine Corps anticipated a/ failure in the operational and outfitting requirements of their supply system. Thereafter, 15 additional steam cleaning units were ordered and sent directly from the Homestead plant to the Marine Corps at Barstow, California, for use or for installation on trailers as replacements for worn-out units. Defendant makes no claim for any delay in connection with this additional order.
15. Plaintiff and Colonel Bethel, the contracting officer, conferred in the latter’s office on April 7, 1952. This conference was held as a result of the telegram informing plaintiff of his “prospective delinquency.” Although defendant made no memorandum concerning this conference, on April 8,1952, it telegraphed Spen as follows:
082022Z Fonecon Mr. Monroe Spen and Major Elrod Home. Advise serial number and source from which steam generator was obtained. You again advised Marine Corps insists upon these units being Homestead Yalve Manufacturing Company factory modified. Acceptance test production pilot model will not be made until this requirement is met.
To this telegram Spen replied by telegram of April 9,1952:
Beurtel 4/8/52 Contract #NOm-62280. Be advised steam generator on hand is Homestead Model JO. Our request for inspection not for acceptance but to facilitate advantageous structural design on complete trailer unit. Have previously ordered 50 each Homestead generators our P. O. 5576 dated 4/3/52, in compliance with your telegram April 2,1952. Please cooperate and have inspector call immediately as we are exerting every effort to have 15 units ready earliest. Appreciate if your office could expedite generators from Homestead. Advise.
*623 The Marine Corps then contacted Homestead- to expedite the furnishing of the complete units to Spen. The Marine Corps then learned that Spen had not as yet placed with Homestead a formal purchase order for the complete unit.
Homestead, under date of April 9, 1952, acknowledged receipt of Spen’s Order No. 5576 and stated, “The Marine Corps has, in the meantime, advised us to furnish these units to you complete as in the case of previous orders including machinery cover, stack, foot valve and strainer, and suction hose with couplings.”
16. Despite plaintiff’s telegram of April 9, 1952, stating that the steam generator on hand was the Homestead Model JO, defendant’s inspector Mr. Eoughton arrived at plaintiff’s plant and found that the unit did not include a factory modified Homestead steam generator. He did inspect the trailer and parts of the unit other than the steam generator.
In his inspection of the unit, Mr. Eoughton observed that the interior coating of the water tanks was not in accordance with the specifications and that the wheel tread of the unit was 59 inches instead of 62 inches as shown on the print. The Marine Corps thereafter wrote to plaintiff on April 15, 1952, stating in part:
The steam generating unit, including the steel cover; steam hose; suction hose; foot valve, and strainer; gasoline engine; water supply pump; compensating valve; stack; and all other integral parts and components comprising the unit must be the Model JO as specified, and shown and described on the attached literature, less only (as delivered on the generating units, the castor wheels, axle shafts, pull rod and fifth wheel).
17. By letter dated April 15, 1952 plaintiff replied that it would abide by the Marine Corps decision under protest and with full reservation to make claim for any additional cost that they alleged would be incurred thereby.
The inspection of the Homestead factory modified pilot model under the subject contract was made Friday, May 2, 1952. Thereafter, performance of the contract was completed by the plaintiff.
18. The Marine Corps, had established its requirements for trailer mounted steam cleaning units from its experience, and as a result of exhaustive field tests usually conducted at *624 its base at Quantico, Virginia. These tests generally take from nine to twelve months to complete. The Homestead type unit was tested in the early part of World War II, and was thereafter used exclusively by the Marine Corps. In prior contracts plaintiff has supplied more than 600 Homestead type trailer units to defendant, and the Marine Corps had only stocks of Homestead parts in its supply system for repair and maintenance. The parts in the 1952 model JO were 89 percent interchangeable with units the Marine Corps had in use, since there had been only slight modifications by Homestead to its original unit first supplied in World War II.
19. The term “Model No. JO (factory modified)” relates to certain factory additions to the DeLuxe gas engine driven Model JO manufactured by the Homestead Valve Manufacturing Company. Of the items for which plaintiff makes claim the following are included as standard equipment on the DeLuxe Model JO: machinery cover and stack, 25-foot asbestos steel vapor hose, and as optional equipment, a cold water supply hose. To meet Marine Corps specifications the unit receives certain factory modifications. Those relevant to plaintiff’s claim include the addition of a 50-foot suction hose for the cold water supply, a foot valve and strainer for the suction hose and an extra canopy gas engine cover. In addition, factory modification includes special painting of Marine Corps color, saturation selector, special gasoline engine shaft — bearing and bearing holder, special double reinforced fan assembly, and steam syphon.
20. Plaintiff claims that it intended to fabricate its own machinery cover and stack, and purchase the hose, foot valve and strainer at prices lower than those charged by Homestead. The loss which plaintiff claims is computed by deducting the cost which plaintiff says it would have incurred if allowed to substitute the above items for Homestead equipment, from the price which Homestead charged for the equipment. The total price of the Homestead equipment is $171.50 per unit; the cost plaintiff claims is proper is $54.13, leaving a difference of $117.37 per unit, or a total of $5,868.50 for 50 units.
21. The cost to plaintiff of the machinery cover was $52.50, and $7.00 for the stack. Plaintiff claims that it could have *625 manufactured a satisfactory machinery cover itself for $19.50, and a suitable stack for $4.17. It is not established that a machinery cover and stack as manufactured by plaintiff would be of like quality or be suitable for use on the Homestead units.
22. Fifty feet of asbestos steam hose is standard equipment on the DeLuxe JO unit. The steam hose carries the steam and stripping compounds under high pressure to the steam gun. The unit operates at a standard pressure of 150 pounds per square inch. With the nozzle closed, the pressure rises to 250 pounds per square inch, and under certain accidental circumstances the pressure can raise to as high as 700 to 800 pounds per square inch. The steam hose used by Homestead consists of a rubber lining, braided steel wiring, asbestos and an outside covering of rubber, and is designed to withstand the highest pressure requirements at operating temperatures. Plaintiff computes its damage on steam hose by comparing the price of $10.90 for Jumbo grade of hose as sold by the Home Rubber Company with the cost of $25.20 for that supplied by Homestead. If allowed to do so, plaintiff would have used the Home Rubber Jumbo hose. This hose is not adequate for use on Homestead units, and could result in bursting of the hose, possibly subjecting the operator to serious injury from the hot steam and stripping compounds.
23. The addition of a suction hose constitutes part of the factory modification of the DeLuxe JO unit. The plaintiff computed his damages by comparing the price of the Homestead hose which is $80.50 with that of the Tiger grade hose quoted by the Home Rubber Company at $18.26 per 50-foot length.
By letter dated March 27,1952 the Home Rubber Company replied to plaintiff concerning its hose as follows:
With respect to our 1" 4-ply Tiger water hose, we cannot state that this would meet your requirement as a suction hose- unless we were more familiar with the vacuum and rate of flow of the pump on the steam jenny. However, its cost is considerably less than a regular wire reinforced suction hose, and of course can be made with more ply at small additional cost * * *.
Defendant’s witness Shane testified that the Homestead generator would develop 22 inches of vacuum when operat *626 ing at maximum capacity from 22 feet, and that tests performed by him on the Home hose showed that it began to collapse at 13 inches of vacuum and was 75 per cent collapsed at 20 inches of vacuum. This would result in “starving” the unit of its water supply, producing unsatisfactory operation. Plaintiff has offered no proof to contradict this testimony.
24. The foot valve is part of the factory modification to Marine Corps specks of the JO unit. Plaintiff’s alleged loss on this item was computed by comparing the Homestead price of $6.30 with that quoted by a jobber known as “The Manufacturers Sales” of $1.30. It has not been established that this foot valve and strainer would be of like quality or satisfactory for use on the Homestead unit.
25. Plaintiff originally installed an Aeroil steam cleaning unit in the first trailer. It was not shown that this unit was suitable for use by the Marine Corps, or that it met with the specifications in the contract. The pilot model which defendant inspected on April 11,1952 did not contain a factory modified Homestead unit. There is no evidence that the Marine Corps failed to inspect any unit made by plaintiff, since it waived pre-shipment inspection on June 17, 1952, after 40 trailer units had been shipped by plaintiff. There is no evidence that more than 50 units were shipped to defendant or that any units so shipped were rejected.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law plaintiff is not entitled to recover, and its petition is therefore dismissed.