MANNING ELECTRIC & REPAIR CO., INC., a Florida Corporation, and Safeco Insurance Company of America, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 608–89C.

United States Claims Court.

Jan. 3, 1991.

Jay L. Cohen, Bethesda, Md., for plaintiff.

Richard R. Kaeser, Lt. Colonel, U.S. Air Force, Office of the Judge Advocate General, Washington, D.C., for defendant.

OPINION

BRUGGINK, Judge.

This dispute, brought pursuant to the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–613 (1988) ("the Act"), comes before the court on defendant's motions to dismiss for lack of jurisdiction and for failure to state a claim, or alternatively, for summary judgment. After considering the parties' written and oral arguments, the court concludes that it has jurisdiction and that the motion for summary judgment is due to be denied.

## I. FACTUAL BACKGROUND

On September 30, 1987, Manning Electric & Repair Co., Inc. ("Manning") entered into contract No. F08650–87–C–0250 with the United States, acting through the Department of the Air Force ("0250 contract"). Manning's task was to "Replace Primary Electric Distribution System, Base Wide, Patrick AFB, FL." Included within the contract is specification PA 87–0034, which is captioned, "Replace Electrical Primary Distribution System." Section 16C of that specification, dealing with 15 volt cable, consists of 11 single-spaced, typed pages, that describe the type of cable to be installed under the contract.

Section 16 sets out certain characteristics of the 15 volt cable to be supplied. Subpart C.01(d) directs that "These cables shall have a performance record demonstrating a minimum of twenty (20) years successful operating experience in the utility and industrial cable applications." Subpart C.03(b) states, "The conductor energy suppression layer shall be extruded over the stranded conductor and shall be insulating material which is compatible with the primary insulation and the conductor...." Subpart C.04(b) states, "The taped insulation shield ... shall have an average thickness at any part of the cable not less than .006 inches...." Finally, subpart C.09, "Qualification Tests," describes specialized testing requirements the cable had to meet. In particular, subpart C.09(b)(5) states, "U-bend test shall be made with samples of 15KV (phase-to-phase) cable

without any covering over the primary insulation, with a conductor size of #1/0 or larger. Cable samples of sufficient length shall be bent around a 10X diameter or smaller mandrel and energized at 50KV, 60 Hertz for a period of 1000 hours minimum with no failures allowed."

The general provisions of the contract also contained a "Material and Workmanship Clause." 48 C.F.R. 52.236 (1990), FAR 52.236–5. This clause provides:

References in the specifications to equipment, material, articles, or patented processes by trade name, make or catalog number, shall be regarded as establishing a standard of quality and shall not be construed as limiting competition. The Contractor may, at its option, use any equipment, material, article, or process that, in the judgment of the Contracting Officer, is equal to that named in the specifications, unless otherwise specifically provided in this contract....

... [T]he Contractor shall also obtain the Contracting Officer's approval of the material or articles which the Contractor contemplates incorporating into the work. When requesting approval, the Contractor shall provide full information concerning the materials or articles. When directed to do so, the Contractor shall submit samples for approval at the Contractor's expense, with all shipping charges prepaid.

Approximately one month after the award of the 0250 contract, the President of Manning, Robert E. Manning, wrote the Air Force the following: "Please add Lewis C. Anderson and James E. Johnson, as persons authorized to bind firm, Manning Electric & Repair Co., Inc. Each are project managers...."

In preparation for its bid for the 0250 contract, Manning received price quotes for cable from both Collier Co. and Kerite Co. through Westinghouse Electric Supply Co. ("WESCO"). During the bid process each manufacturer represented that its cable would meet the specifications as outlined within the contract documents. Manning used the Collier cable quote in forming its bid. After Manning received the 0250

award, it proceeded to order Collier cable from its supplier. The supplier informed Manning at that point, however, that Collier cable could not meet the cable testing requirements of the specifications. The supplier then substituted the Collier cable with Hi–Tech cable.

On November 23, 1987, Manning submitted to the Government for approval a sample of Hi–Tech cable along with a specification sheet. The Contracting Officer rejected the use of this type of cable, however, on four grounds. First, the specification sheet provided no information concerning the operating experience of Hi–Tech cable. Second, the cable conductor shielding, the layer immediately adjacent to the metal conductor, was described in the specification sheet as an "extruded semi-conducting layer over the conductor...." Third, the specification also noted that the insulation was to be "covered with an extruded layer of semi-conducting thermosetting material which shall be identified as being semi-conducting...." Fourth, the specification provided that "Physical and electrical tests would be conducted in accordance with the requirement of ICEA No. S–68–516 (NEMA WC8–1976), Underwriters Laboratories Standard 1072 for Medium Voltage Solid Dielectric Cable (MV90), and AEIC No. 6 [Association of Edison Illuminating Companies]." The U-Bend Test of ICEA S–68–516 provides for the cable to be bent around a mandrel and energized at 60 Hertz, without specifying the voltage.

After having received notice that the Hi–Tech cable did not meet the contract specifications, Manning requested the Air Force to provide a listing of "at least three manufacturers of the cable in question." On February 5, 1988, the Contracting Officer responded: "Three manufacturers of quality medium and high voltage cable are Kerite Co., Okonite, and Pirelli Cable Co. It is still necessary for this organization to review submittals on any cable intended for use by the contractor."

As a result of a meeting held between Manning and the Government on February 29, 1988, the Air Force agreed to reevalu-

ate Hi–Tech cable and to evaluate Pirelli cable and Okonite cable. Manning then sent the Air Force advance copies of the manufacturer's submittals for each of the cables. No submission was made with respect to Kerite Cable. After reviewing the submittals of Hi–Tech, Pirelli, and Okonite, the Air Force informed Manning that "none of them meet our requirements as stated in the specifications. Therefore, if submitted for consideration, they will be disapproved."

On April 12, 1988, Lewis Anderson wrote the Air Force that Manning would order cable that met the specifications and submit a "claim for the excess direct and associated cost, plus ripple effect." Subsequently, Manning ordered cable from Kerite Co. which met the contract specifications without dispute. The order with Hi–Tech was cancelled. On July 28, 1988 Manning submitted a claim against the United States for $92,187. Anderson certified and signed the claim as Project Manager. On November 9, 1988, the Contracting Officer denied Manning's claim in its entirety.

During the period 1985–1989, Anderson was employed as a "Project Manager" by Manning. As Project Manager, he ran concurrently approximately 20 different contracts, each of which had its own "Project Superintendent." Anderson reported directly to the President of the company, Robert Manning. Mr. Manning had delegated to Anderson complete authority to sign and bind the corporation to all contracts involving underground and high voltage electrical work.

Anderson had full general supervisory powers and responsibilities for the contract under dispute and for all projects under his supervision. His job included performing and/or supervising the estimation of bids, preparation of written quotations and offers, management of contracts after award, negotiation of contract changes, and preparation and filing of contract claims. Throughout his tenure, Anderson negotiated and signed contracts and change orders on behalf of Manning without any monetary limitation with the Navy, the Air Force and various private contrac-

tors. In addition, Anderson signed many certified claims. As to the contract in dispute, Anderson signed virtually all change orders and represented Manning at most of the meetings with the Government regarding significant contract matters.

On November 9, 1989, Manning appealed the Contracting Officer's final decision to this court.

## II. DISCUSSION

A. The Motion to Dismiss.

■ Defendant argues that this court lacks jurisdiction because plaintiff did not properly certify its claim. The Act requires that, for claims in excess of $50,000, the contractor must certify that the claim is made in good faith, and that, to the best of the contractor's knowledge and belief, the supporting data are accurate and complete. 41 U.S.C. § 605(c)(1). This requirement is jurisdictional. *Ball, Ball & Brosamer, Inc. v. United States*, 878 F.2d 1426, 1428 (Fed.Cir.1989).

The contract at issue is governed by Federal Acquisition Regulation ("FAR") 33.-207. This regulation controls who may certify claims under the contract. In relevant part, it provides as follows:

(c)(1) If the contractor is an individual, the certification shall be executed by that individual.

(2) If the contractor is not an individual, the certification shall be executed by—

(i) A senior company official in charge at the contractor's plant or location; or

(ii) An officer or general partner of the contractor having overall responsibility for the conduct of the contractor's affairs.

Because Anderson is a "Project Manager" and not an officer or general partner of the contractor, the inquiry is whether he is a "senior company official in charge at the ... location involved." *See Al Johnson Constr. Co. v. United States*, 19 Cl.Ct. 732 (1990). A "project manager can be a senior official for purposes of certifying a claim,

if vested with sufficient powers." *Id.* at 736.

The court concludes that the claim was properly certified. Anderson was a figure with significant authority within the Manning organization. He supervised about 20 different projects and exercised general supervisory powers and responsibilities, including but not limited to, the negotiation of all contract changes and the preparation and filing of all contract claims without any dollar limitation. He had authority to run his projects as he thought necessary and had full contract authority to bind the company. He was specifically in charge of the work at issue.

*Donald M. Drake Co. v. United States,* 12 Cl.Ct. 518 (1987), does not help the defendant. In *Drake,* the ultimate responsibility to act on behalf of the corporation rested in the Executive Vice–President, not the project manager. The Executive Vice–President of the company was responsible for reviewing and drafting the claim. Here, Anderson had authority to bind the corporation without first obtaining approval from a superior. Nor does *Al Johnson* support defendant's position. In that case, the project manager had authority only to certify claims for less than $50,000, and home office executives involved themselves in all controversial matters. The court concludes that Anderson was a "senior company official in charge at the location."

█ The defendant also moves to dismiss on the ground that the claim is untimely. It contends that plaintiff's assertion that the Government improperly used a proprietary specification should have been brought before the contract award. This argument is without merit. Plaintiff's contention is that the materials it supplied met the requirements of the contract. In any event, it was only after contract execution and performance that the issue surfaced. The question of whether the specifications were proprietary now affects whether plaintiff performed and will be considered in connection with the summary judgment motion.

**B. The Motion for Summary Judgment.**

Defendant moves for summary judgment on the ground that none of the cables submitted by plaintiff (Hi–Tech, Okonite and Pirelli) satisfied the specifications. Defendant asserts the contract was clear and unambiguous and that the Government is entitled to that for which it contracts. Because of the procedural posture of the case, the issue is whether there is any believable evidence that supports the plaintiff's contention that the cables offered either met the specifications or satisfied the requirement of the Material and Workmanship Clause that the material offered be functionally and qualitatively equivalent.

█ It is well settled that the Government is entitled to receive that for which it contracts. *Data Gen. Corp. v. United States,* 915 F.2d 1544 (Fed.Cir.1990); *American Elec. Contracting Corp. v. United States,* 217 Ct.Cl. 338, 579 F.2d 602 (1978); *Henry Spen & Co. v. United States,* 139 Ct.Cl. 613, 153 F.Supp. 407 (1957); *Farwell Co. v. United States,* 137 Ct.Cl. 832, 148 F.Supp. 947 (1957). In *Wilner Construction Company,* ASBCA No. 25719, 83–2 BCA ¶ 16,886 at 84,036, 1983 WL 13341, the Board recites:

> When the subcontractor/supplier involved in this dispute submitted equipment for approval without knowing whether it met the characteristics called for by the specification, it assumed the risk that it would be rejected. As an experienced supplier of electrical equipment under Government contracts, the subcontractor must have known that the Government has the right to insist upon compliance with the specification.

Here, it is not disputed that the cables offered were not insulated in the particulars required. They thus did not literally meet contract specifications. The court rejects plaintiff's suggestion that the requirements at issue were not explicit. An agency should be able to assume that a contractor will have or obtain reasonable technical competence in evaluating the specifications. *See Intercontinental Mfg. Co. v. United States,* 4 Cl.Ct. 591, 599 (1984); *H.N. Bail-*

*ey & Assoc's. v. United States,* 196 Ct.Cl. 166, 178, 449 F.2d 376, 383 (1971).

 When reviewing the Contracting Officer's decision to reject materials as compliant with a specification, the court should defer to the agency's decision unless it was arbitrary and capricious. As the Federal Circuit recently held in *Data General,* "the board has no warrant to question the agency's judgment or to revise its delegation of procurement authority to ensure that the agency's assessment of its 'true' needs is in harmony with the board's. The board has neither the authority nor the expertise to second-guess the agency." *Data Gen.,* 915 F.2d at 1552. Mindful of this admonition, fully applicable to this tribunal, the court considers the facts presented on summary judgment here.

The contract at issue has a Material and Workmanship Clause. That clause provides that references to brand names in the specifications establish only a standard of quality, which means that substitute goods may satisfy the contract requirements if they are equal to the named item. The Court of Claims has also held that a detailed description of an item, which is found to be produced by only one manufacturer, is equivalent to the use of a brand name and should be treated as such. *Sherwin v. United States,* 193 Ct.Cl. 962, 977, 436 F.2d 992, 1000 (1971); *Urban Plumbing & Heating Co. v. United States,* 187 Ct.Cl. 15, 23–24 n. 3, 408 F.2d 382, 386 n. 3 (1969), *cert. denied,* 398 U.S. 958, 90 S.Ct. 2164, 26 L.Ed.2d 542 (1970). Permitting the substitution of equal products in such a circumstance serves the purpose of promoting competition by allowing a greater range of manufacturers which would be eligible to supply the item required.

 When a contractor substitutes an item for a brand name product, it must show (1) that the specifications are proprietary, and (2) that it submitted information showing an equal substitute product, and (3) the substitute is the functional equivalent or of the same standard of quality. *See The Triax Company,* ASBCA No. 31231, 89–1 BCA ¶ 21,485 at 108,236, 1988 WL 134392.

 To show that the contract specifications were, effectively, proprietary, plaintiff relies on the two affidavits of Noah E. Eberhart, plaintiff's expert engineer. He states in his first affidavit that, "PA 87–0034, 16C was obviously written around the KERITE Cable Specification." Eberhart supports his conclusion by noting that sections 16C.03b and 16C.09 of the specifications were uncommon requirements met only by Kerite. Section 16C.03b specifies *that the conductor energy suppression layer be made of insulating material and does not require this suppression layer to be bonded to the insulating material.* Eberhart stated that "Kerite was the only company" which manufactured cables using such a design. He also notes the "Kerite variation of the U–Bend test is not a standard Industry test." Even though the specification did not use a brand name, or proprietary descriptive terminology, as a practical matter, it is undisputed that only Kerite could literally meet the specifications. The court concludes that plaintiff has, at a minimum, created an issue of fact as to whether the specification is proprietary, and can thus rely, in answering the motion, on the Material and Workmanship Clause.

 Plaintiff offers the two affidavits of Eberhart to support its argument that all three types of cable offered by it met the essential functional and quality standards of the specifications. As to a performance record demonstrating a 20 year successful operating experience, Eberhart states that Pirelli and Okonite have produced insulated medium voltage cable since at least 1964. He states that the Kerite cable insisted upon by the Government in fact had only a 10 year performance record. Eberhart also asserts that the semi-conducting cable offered by Manning met all functional requirements despite the specification that there be a conductor energy suppression layer made of insulating material. He states that the semi-conducting material used by Hi–Tech is better than the insulating material used by Kerite because it eliminates corona discharge effect and reduces the amount of heat loss in the cabling.

With respect to the requirement that the cable have taped insulation, plaintiff's assertion that this provision was amended to eliminate taping appears to be correct. Finally, Eberhart explains that the only qualification test listed in section 16C.09 which plaintiff's submissions failed, the modified U–Bend test, is irrelevant to cables constructed with a bonded semi-conducting shield. He asserts that the test results for Hi–Tech cable satisfied all the essential performance and quality characteristics of the specification.

As part of its reply, the defendant offers the affidavit of Steven Brown, Supervisor of the Exterior Electrical Shop at Patrick AFB. His brief affidavit is noteworthy in two respects. First, it does not directly challenge the assertions in Eberhart's first affidavit that the specification is in effect proprietary, and that Pirelli, Okonite, and Hi–Tech all meet the most rigorous, state of the art, industry standards, including the prevention of the corona effect. Instead, Brown states that the specification was a result of certain requirements—high reliability, minimal preventative maintenance, and an ability to be easily spliced. Eberhart's second affidavit addresses each of these criteria and asserts that all three alternative cables satisfy these requirements. The plaintiff thus raises an issue of fact in this regard.

A second aspect of Brown's affidavit offers an additional consideration which has the effect of mooting this fact issue, however. In the closing paragraph to his affidavit, Brown recites:

It should also be noted that the cable installed under this contract is intended to serve as a test case for this new type of cable system. The performance history of cable with a non conducting, energy suppression layer over the conductor, will be directly compared to the interconnected cable of other manufacturers on a life cycle basis.

Here is certainly a criteria that cannot be satisfied by invocation of the Materials and Workmanship Clause. It is undisputed that none of the alternative cables have an "insulating" energy suppression layer extruded over the stranded conductor. (The parties are agreed that "insulating" is synonymous with "non-conducting.") The cables offered by plaintiff use a semi-conducting energy suppression layer. While Eberhart asserts that Pirelli, Okonite, and Hi Tech are the functional and qualitative equivalents of Kerite, they cannot be used in an experiment to test the effect of cable that is literally non-conducting. Eberhart is merely arguing that there is no need to conduct such a test because he knows what the results will be.

■ The Government has a complete right to conduct such an experiment. It can insist on testing for itself whether non-conducting cable better serves its purposes. The difficulty with such a desire on the Government's part, however, is that it was not expressed in the contract documents. This purpose was hidden until Brown's affidavit, which surfaced in the defendant's final pleading. Permitting the Government to reject cables which plaintiff contends are the functional and qualitative equivalent, on the theory that the Government wishes to test that hypothesis, would have the effect of nullifying the Material and Workmanship Clause.

■ Plaintiff clearly has to assume the known or knowable risk that an offer not in strict compliance with the specifications can be rejected. Undertaking that risk becomes more reasonable when there is a Material and Workmanship Clause, and when the contractor is convinced that its product is functionally and qualitatively equivalent, or better. The contractor has the right, in putting together its bid, to rely on that clause, unless the specifications give an unequivocal indication that literal compliance is required as to a particular material, despite the clause. The Government must note, however, the salient or essential characteristics it requires of the product so that bidders may effectively form their bids and choose their suppliers. *Blount Bros. Corp. v. United States*, ASBCA No. 31202, 88–3 BCA ¶ 20,878 at 105,574, 1988 WL 63458. Here, the Government was arbitrary and capricious in relying on an undisclosed purpose which

directly affected the contractor's ability to comply with the specifications. *See R.R. Mongeau Engineers, Inc.*, ASBCA No. 29,-341, 87–2 BCA ¶ 19,809, at 100,192, 1987 WL 40882; *Elrich Constr. Co.*, GSBCA No. 3657, 73–2 BCA ¶ 10,187 at 47,968, 1973 WL 1968.

The court concludes that the Government may not rely on the inability of the alternate cables to satisfy its interest in conducting a test of insulating cable. As to other requirements, the court finds that there are issues of fact as to the functional and qualitative equivalence of the alternative cables offered and that summary judgment is thus precluded.

### CONCLUSION

The motions to dismiss and for summary judgment are denied. The parties are directed to file a joint status report proposing further pretrial activities and dates on or before February 4, 1991.