**PRINCIPAL MUTUAL LIFE INSURANCE COMPANY,**
Plaintiff,

v.

**The UNITED STATES, Defendant.**

**No. 486–87T.**

United States Court of Federal Claims.

Aug. 26, 1993.

158

Bruce Graves, Des Moines, IA, for plaintiff.

Robert C. Markham, Washington, DC, with whom was Mildred L. Seidman, Michael J. Dennis, Dept. of Justice, Tax Div., and James A. Bruton, Acting Asst. Atty. Gen., for defendant.

OPINION

SMITH, Chief Judge.

This case is before the court on defendant's Motion for Reconsideration pursuant to Rules 59(a) and 83.2(f) of the Rules of the United States Court of Federal Claims (RCFC). The court's earlier opinion in this case, *Principal Mutual Life Insurance Company v. United States*, 26 Cl.Ct. 616 (1992), granted plaintiff's cross-motion for summary judgment concerning the waiver of premium benefits, monthly payments from life insurance, advertising expenses, and state examination fees.[1] The United States contends that this opinion was erroneous for three reasons. First, defendant contends that the portion of the opinion concerning plaintiff's advertising expenses should be stricken as that matter was allegedly settled prior to the issuance of the opinion. Second, defendant argues that the test employed in the court's opinion to distinguish between life and accident and health insurance is unworkable and conflicts with Internal Revenue Code Section 801(b)(1)(B). Finally, the United States asks the court to reconsider its conclusion that panels of the United States Court of Appeals for the Federal Circuit failed to follow *New World Life Insurance Co. v. United States*, 88 Ct.Cl. 405, 26 F.Supp. 444 (1939), *aff'd*, 311 U.S. 620, 61 S.Ct. 314, 85 L.Ed. 393 (1940), when they affirmed *Ohio National Life Insurance Co. v. United States*, 807 F.2d 1577 (Fed.Cir.1986), and *Peoples Security Life Insurance Co. v. United States*, 833 F.2d 1001 (Fed.Cir. 1987).

Upon full consideration of defendant's arguments, and for the reasons set forth below, the court grants in part and denies in part defendant's motion for reconsideration.

FACTS

Because of the complexity of the issues involved, a brief recitation of the facts is

---

1. The court also granted defendant's motion for summary judgment as it applied to agents' debit balances and to monthly income pursuant to accident and health insurance. Those portions of the opinion have not been challenged by plaintiff.

warranted. A full statement of the facts and discussion of the insurance reserves structure is set forth in the court's earlier opinion. *See Principal Mutual*, 26 Cl.Ct. at 618–621.

Plaintiff, Principal Mutual Life Insurance Company (Principal), is a mutual insurance corporation organized and existing under the laws of the state of Iowa. Its primary business is writing various forms of life and health and accident insurance. During 1977 and 1978, Principal treated various state mandated reserves as deductible from its income.[2] In addition, Principal deducted from its income the costs of various advertising expenses. As a result of these and other deductions, Principal's taxable income for 1977 and 1978 was reduced significantly. In August of 1981, the Internal Revenue Service assessed an income tax deficiency of $2,486,917.33 against plaintiff for tax year 1977 and $3,678,350.01 for tax year 1978.

During the years in question in this case, Principal provided group insurance policies which were typically issued to employers as the group policyholder. These policies obligated Principal to provide insurance coverage for renewable one year terms[3] for employees who were actively employed by the group policyholder. Employees covered by these policies were referred to as either "active employees" or "active lives." Employees who became "totally and permanently disabled" while insured under the contract typically received a waiver of the premium and a monthly income. Employees who could demonstrate total and permanent disability were referred to as "disabled employees" or "disabled lives." Once an employee became disabled, Principal was obligated to continue providing these benefits even if the group policyholder cancelled or failed to renew the group insurance contract.

Plaintiff established both an "active lives reserve" and a "disabled lives reserve" to keep sufficient funds to satisfy its obligations under the group policies. When an employee became totally and permanently disabled, the active lives reserve for that employee was eliminated and a disabled lives reserve was created. The basic purpose of the disabled lives reserve was to provide for the payment of a death benefit to disabled employees who died while disabled. However, there were three types of disabled lives reserves which provided three different benefits: (1) waiver of premium benefits; (2) pre-death monthly payments of the life insurance death benefit; and (3) monthly disability income pursuant to accident and health insurance. Only the monthly payments from the life insurance death benefit are at issue in defendant's motion for reconsideration.

Under some of the life insurance policies at issue in this case, disabled employees were entitled to receive the face value amount of their life insurance payable in sixty equal monthly installments so long as the employee remained disabled throughout the sixty-month period. Principal ceased payment after the sixtieth installment, the date of death, or the date of recovery from disability, whichever occurred first. If the disabled employee died before the final installment was paid, Principal paid the commuted value of the unpaid installments to the employee's beneficiary. Thus, the benefits paid to employees monthly from their life insurance policy's face amount during disability: (1) arose from a life insurance contract; (2) were measured by the amount of the employee's life insurance in force; (3) were paid out upon the contingency of death while disabled or pursuant to an acceleration option; and (4) were restored to life insurance upon the employee's recovery from the disability.

On June 30, 1992, the court determined that the disabled lives reserves established

---

2. Reserves are established by insurance companies to set aside sufficient funds to cover anticipated liabilities under their policies. States require the establishment of reserves to protect policyholders and to ensure the solvency of insurance companies.

3. Principal was not obligated to renew these policies and could discontinue them by giving 31 days' notice to the group policyholder.

by Principal to provide monthly payments from life insurance qualified as life insurance reserves under Section 801 of the Internal Revenue Code (IRC) and, therefore, were properly treated as deductions by plaintiff for the years in question. In so holding, the court recognized that while the contingency of disability triggers a payment obligation under plaintiff's life insurance policy, the "overriding contingency insured against under this policy is the occurrence of death." *Principal Mutual,* 26 Cl.Ct. at 628. In addition, the court found that plaintiff properly deducted investment related advertising expenses in 1977 and 1978. Prior to the court's decision, however, the parties had been actively engaged in settlement negotiations concerning the advertising expenses. Defendant maintains that the parties did, in fact, settle that issue and neglected to inform the court before the decision was issued. Plaintiff contends that there was never a settlement agreement reached between the parties.

## DISCUSSION

I. THE ALLEGED SETTLEMENT OF THE ADVERTISING EXPENSE ISSUE

The government asserts that the portion of the court's earlier opinion addressing advertising expenses has been rendered moot by a settlement of that issue. Specifically, defendant contends that "[t]he parties have reached a settlement of the advertising expenses issue, encompassing both the printing and duplicating costs associated with the distribution of the plaintiff's annual report and financial statement, and the general institutional advertising costs (which includes its claimed promotion costs.)" [4] Plaintiff disputes this contention, arguing that: (A) there was never a mirror-image acceptance of plaintiff's offer; (B) that there was never stipulation for partial dismissal filed; and (C) plaintiff is not estopped from contending that the advertising expense issue was not settled. As the court finds that defendant validly accepted plaintiff's offer, and that the fail-

ure to file a stipulation is not fatal to the resulting agreement, there is no need to address the estoppel argument. The court's reasons for its conclusions are set forth below.

### (A) Mirror–Image Acceptance

On January 29, 1991, plaintiff's counsel sent a letter to defendant's counsel proposing:

that the advertising expenses which were directly related to investment during the taxable years, consisting of (1) the costs of duplicating and distributing the taxpayer's annual financial statements to mortgage loan brokers and investment bankers and (2) the costs of certain promotional items ... distributed by the investment department, in the amounts of $35,303 in 1977 and $41,665 in 1978, be allowed as investment expenses under Section 804(c) of the Code in effect during these taxable years.[5]

In addition, plaintiff proposed that the ratio of the taxpayer's gross investment income to its total income, for purposes of allocating the state income taxes to investment under Section 804(c), would be 23.19% for 1977 and 24.02% for 1978.

On February 5, 1991, defendant replied to plaintiff's letter setting forth the government's understanding that:

[t]he claims for general advertising expenses as investment expenses ... would be resolved by allowing as investment expenses costs of duplicating and distributing plaintiff's annual financial statement to loan brokers and investment bankers and the costs of certain promotional items distributed by the investment department. The total amounts to be allowed are $35,303 for 1977 and $41,665 for 1978.

\*       \*       \*       \*       \*       \*

We understand that your offer in compromise is made in full settlement of the issues aforementioned and, if accepted, will result in the filing of a stipulation

---

**4.** Defendant's Motion at 2.

**5.** Appendix B to Defendant's Motion at 3.

for dismissal of the issues involved with prejudice, the parties to bear their respective costs, including any possible attorneys' fees or other expenses of litigation with respect to such litigation.[6]

The government also acknowledged plaintiff's proposed ratios of gross investment income to total gross income for 1977 and 1978. Plaintiff was asked to advise defendant in writing whether the government's understanding of the offer was correct. Finally, the government stated that plaintiff's offer would "be processed in accordance with our usual procedure, including obtaining the views of the Chief Counsel, Internal Revenue Office.... We are sure you understand that unless you receive a formal notice of acceptance from this office, the Department is in no way committed to a settlement." [7]

In the government's view, formal notice of acceptance of plaintiff's settlement offer was given in defendant's June 10, 1991 letter to Principal's counsel. In that letter, defendant restated its understanding of plaintiff's offer and advised plaintiff that "this offer has been accepted on behalf of the Attorney General." However, defendant added that "[i]t is our understanding that no refund will result from this action, pending resolution of other issues in this case." [8] Plaintiff argues that neither this letter nor the February 5, 1991 letter can be construed as acceptances because they contained variant terms from plaintiff's offer.

■ As plaintiff points out, it is an elementary principle of contract law that a purported acceptance must mirror the terms of the offer to result in the formation of a contract. A.L. CORBIN, CORBIN ON CONTRACTS § 86 (1963) ("If the purported acceptance attempts to restate the terms of the offer, such restatement must be accurate in every material respect.... A variation in the substance of the offered terms is material, even though the variation is slight."). Plaintiff contends that the acknowledgement letter recharacterized

plaintiff's offer by referring to "general advertising expenses" rather than those "directly related to investment." In addition, plaintiff challenges defendant's statement regarding costs and attorney fees as an unacceptable variation from plaintiff's offer. Finally, plaintiff argues that even if the acknowledgement letter did not constitute a counter offer extinguishing Principal's offer, defendant's June 10, 1991 letter cannot be considered an acceptance because of the refund terms.

Defendant responds that the acknowledgement letter does not amount to a counter-offer as it merely stated the government's understanding of Principal's offer and invited plaintiff to notify defendant if that understanding was erroneous. The court finds the government's position in this regard to be persuasive as plaintiff did not object to defendant's understanding until after the opinion in plaintiff's favor was issued. As the United States Court of Appeals for the First Circuit noted in the seminal case of *Dickey v. Hurd,* 33 F.2d 415, 418 (1st Cir.), *cert. denied,* 280 U.S. 601, 50 S.Ct. 82, 74 L.Ed. 646 (1929):

> When Mr. Hurd received these communications, he was fully apprised of how Mr. Dickey understood the language of his offer, and, if that was not the meaning which he intended to give to it, it was his duty to have at once informed him.... It was not open to him to lie quietly until after the time of acceptance had expired and then say ... you have not met the requirements.

■ The court also rejects plaintiff's contention that the refund terms in defendant's June 10, 1991 letter were an unacceptable variance from Principal's offer. Indeed, the court finds this assertion dubious in light of plaintiff's counsel's January 21, 1992 letter to defendant's counsel which offered to settle the advertising expense issue for the 1979 through 1981 taxable years *"on the same basis as was done in Plaintiff's case for the 1977–1978 taxable*

---

6. Appendix B to Defendant's Motion at 5.

7. Appendix B to Defendant's Motion at 6.

8. Appendix B to Defendant's Motion at 7.

*years."* [9] Thus, the court finds that Principal's January 29, 1991 offer to settle the advertising expense issue for the 1977 and 1978 taxable years was validly accepted by the government's June 10, 1991 letter.

### B. The Failure to File a Stipulation for Partial Dismissal

Plaintiff contends that the correspondence between the parties clearly reflects an intention that a stipulation of dismissal would be executed and filed to complete the settlement negotiations. Plaintiff's January 29, 1991 letter specifically provided that, if the proposal was acceptable to the government, the parties would "proceed with the usual stipulation of dismissal concerning these issues." In addition, in the government's June 10, 1991 acceptance letter, defendant advised plaintiff that counsel for the government would "be in touch ... regarding the filing of an appropriate stipulation to reflect the settlement of these two matters." Thus, plaintiff argues that even if the terms of its offer were validly accepted by defendant, the failure to file a stipulation renders the resulting agreement merely tentative in nature.

In support of that contention, plaintiff relies upon *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978). However, that reliance is misplaced. In a footnote to that case, the Court rejected a mootness claim based upon a settlement agreement where the agreement was tentative and a stipulation of dismissal was not executed. The Court did not, however, as plaintiff implies, find that the lack of a stipulation of dismissal rendered the agreement tentative. In fact, the court described the agreement itself as tentative before addressing the stipulation issue: "[t]he parties entered into a tentative settlement agreement. Respondents and petitioners in [a related case] agreed to dismiss that petition; petitioner in this case, however, did not stipulate to dismiss-

al of its petition." *Id.* at 465 n. 3, 98 S.Ct. at 2456 n. 3. Thus, the failure of the parties to stipulate to dismissal in that case was merely further evidence of what was already a tentative agreement.

▇ This approach is in keeping with the well established rule that a binding contract is created at the time the parties reach a final agreement through offer and acceptance, rather than later when the agreement is formally executed by both sides. *United States v. Purcell Envelope Co.,* 249 U.S. 313, 319, 39 S.Ct. 300, 301, 63 L.Ed. 620 (1919); *see also Dale Construction Co. v. United States,* 168 Ct.Cl. 692, 709 n. 8 (1964) (where the parties have reached a binding settlement agreement "it is immaterial that the parties may have contemplated a later, more formal instrument."). In the instant case, as found above, the parties entered into a valid settlement agreement. The correspondence relied upon by plaintiff does not suggest that the filing of a stipulation of dismissal was a condition precedent. Indeed, the government's acceptance letter expressly stated that a stipulation would "reflect" the agreement which had already been reached. As such, a stipulation was not essential to the validity of the parties' settlement agreement. *Cheyenne–Arapaho Tribes, et al. v. United States,* 671 F.2d 1305, 229 Ct.Cl. 434 (1982). As the court has found the parties in this case entered into a binding settlement agreement concerning the advertising expenses claimed as investment expenses by plaintiff in this case, that issue is hereby declared moot.

### II. DISABLED LIVES RESERVES ESTABLISHED FOR MONTHLY PAYMENTS FROM LIFE INSURANCE

Under IRC 801(b), life insurance reserves are amounts which are computed on the basis of recognized morbidity tables and assumed rates of interest and

---

**9.** Appendix B to Defendant's Motion at 10 (emphasis added). Plaintiff's claims that its counsel lacked settlement authority are equally unavailing. Any lack of authority was cured by plaintiff's failure to object to the settlement agree-

ment within a reasonable time. *Smedley v. Temple Drilling Co.,* 782 F.2d 1357, 1361 (5th Cir.1986) (A client's failure to object in a timely manner ratifies an unauthorized settlement).

... are set aside to mature or liquidate, either by payment or reinsurance, future unaccrued claims arising from life insurance, annuity, and noncancellable health and accident insurance contracts (including life insurance or annuity contracts combined with noncancellable health and accident insurance) involving, at the time with respect to which the reserve is computed, life, health, or accident contingencies.

26 U.S.C. § 801(b)(1)(B). In addition to those requirements, life insurance reserves must be required by law in order to qualify as such under Section 801(b). *Id.* In its earlier opinion, the court held that Principal's disabled lives reserve, established for monthly payments to employees from their life insurance benefits upon disability, is a life insurance reserve under Section 801(b). The government now asserts that the reserve cannot qualify as a life insurance reserve because it is a disability benefit derived from a cancellable group contract. Because the life insurance policy in the instant case is combined with accident and health insurance, defendant argues that the disabled lives reserve fails to meet the statutory requirements under Section 801(b).

The government reads the statute quoted above as "expressly deal[ing] with the situation in which the policy insures against death and also provides benefits for sickness or injury resulting in death, designating such policies 'life insurance or annuity policies combined with noncancellable accident and health insurance.'"[10] In the government's view, the statute provides that in a case in which a policy contains a combination of benefits, the health and accident insurance must be noncancellable. Thus, defendant argues, the court erred in examining the overriding or predominant character of the policy at issue in this case. The court disagrees.

Section 801(b) defines life insurance reserves as amounts set aside for future claims arising from "life insurance, annuity *and* noncancellable health and accident insurance (including life insurance or annuity

contracts combined with noncancellable health and accident insurance)...." Hence, the statute refers to three types of contracts: life insurance, annuity, and noncancellable health and accident insurance. Combined types of contracts are merely a mixture of the three. The life insurance category clearly includes contracts, such as those involved in this case, which provide life insurance benefits only. The group policies issued by Principal provide for the payment of a sum based upon the amount of the employees' life insurance in force. If the insured became totally and permanently disabled, the monthly payment is $17.70 per $1000 of life insurance. If the employee dies while receiving monthly payments, his beneficiary receives the commuted value of the remaining installments. If the insured recovers, the face amount of his life insurance is reduced by the amount of the payments made to him while he was disabled. Thus, the only benefit provided by the group policies at issue is a death benefit which can be accelerated and paid out in monthly installments in the event of total and permanent disability.

While the life insurance contracts at issue provide for monthly insurance payments upon total and permanent disability, this does not transform them into life insurance contracts combined with health and accident insurance under Section 801(b)(1). Unlike other policies which provide benefits upon death and separate benefits for health and accident contingencies, the benefits under the group life insurance contracts at issue here are interdependent. The maximum amount paid out by Principal during disability and upon death cannot exceed the amount of life insurance in force. Health and accident disability payments normally end upon the death of the insured and the insured's beneficiary does not receive the balance of any installment payments.

Defendant also contends that the distinction between the types of policies recognized in the court's earlier opinion amounts to a standard which would be impossible to

**10.** Defendant's Motion for Reconsideration at 5.

apply in many instances. The government admits that there is a dollar-for-dollar reduction in the principal amount of death benefits payable to a disabled insured who dies while disabled and only one accident and health benefit at issue in this case. However, defendant asserts that in other cases, "a plethora of accident and health benefits, such as hospitalization, surgical expense, loss of time, maternity, and others, may be packaged together with a death benefit."[11] The court's opinion, in the government's view, would allow any kind of insurance, even casualty insurance, to be treated as life insurance simply by packaging them with a death benefit in a policy with a ceiling on the amount of benefits payable.

There are several reasons why defendant's concerns are not persuasive. First, as plaintiff points out, an insurance company could not package casualty coverages together with death benefits in order to change the overriding characteristic of the policy for tax purposes without violating state law and its casualty charter. In addition, reserves established for casualty claims are accrued liabilities which do not come within the purview of Section 801(b)(1)(B). Most importantly, however, under the Tax Reform Act of 1984, the deduction for interest credited to nonlife insurance reserves is allowed on the same basis as interest credited to life insurance reserves. Thus, there would be no tax incentive to package health and accident benefits with life insurance benefits.

■ Moreover, the government's arguments concerning the court's ruling on the disabled lives reserves established for monthly payments from life insurance present no "manifest error of law or mistake of fact." *Weaver–Bailey Contractors, Inc. v. United States,* 20 Cl.Ct. 158 (1990). Instead, defendant "merely reasserts ... arguments previously made ... all of which were carefully considered by the court." *Frito–Lay of Puerto Rico, Inc. v. Cañas,* 92 F.R.D. 384, 391 (D.C.Puerto Rico 1981). Accordingly, there is no reason to grant the government's motion for reconsideration on the disabled lives reserve issue.

III. *OHIO NATIONAL LIFE INSURANCE CO. V. U.S.* AND *NEW WORLD LIFE INSURANCE CO. V. U.S.*

■ Finally, the government argues that the affirmances by the Federal Circuit of the Claims Court decisions in *Ohio National* and *Peoples Security* are not inconsistent with *New World* and, hence, represent binding precedent. In *New World,* the Court of Claims defined general expenses under § 804(c)(1) as those "which are not definitely and entirely either investment or underwriting expenses." 88 Ct.Cl. at 458, 26 F.Supp. 444. To be deductible under *New World,* a general expense must "with some degree of reasonableness, be said to have some direct relationship to the investment department and also to be reasonably susceptible of division and assignment" to the investment department. *Id.* at 435, 26 F.Supp. 444.

In its previous opinion in the instant case, the court found that *Ohio National* construed *New World* as setting forth a more stringent standard for evaluating general expenses. *Principal Mutual,* 26 Cl.Ct. at 633–34 (noting that the court in *Ohio National* found that *New World* offered "more particularized expressions of the general definition for investment expenses."). In addition, this court acknowledged that this interpretation of *New World* had been adopted by *Peoples Security* and that both the latter and *Ohio National* were affirmed *Per Curiam* by the Federal Circuit. *Id.* at 634–635. However, as the court expressed in the previous opinion, the government's interpretation of the decisions in *Ohio National* and *Peoples Security* are inconsistent with *New World.* Thus, the court is barred from following these interpretations until the Federal Circuit issues an *en banc* decision overruling *New World. Id.* at 635. As that has not yet occurred, the court again declines to apply a more stringent standard for evaluating general expenses than that estab-

---

**11.** Defendant's Motion at 5–6.

lished by the Court of Claims in *New World.*

## CONCLUSION

For the foregoing reasons, the court declares the portion of its earlier opinion concerning advertising expenses moot as a result of the parties' settlement agreement but denies the remainder of defendant's motion for reconsideration. As established by the court's June 3, 1993 order, the parties shall have sixty days from the date of this opinion to submit a joint status report.