**AMERICAN RENOVATION & CONSTRUCTION COMPANY, INC., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 96–571C.

United States Court of Federal Claims.

Sept. 22, 1999.

Order Denying Reconsideration
Oct. 13, 1999.

William L. Bruckner, San Diego, California, counsel of record for plaintiff.

Andrea I. Kelly and Kirk T. Manhardt, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., for defendant, with whom were, David M. Cohen, Director, and Frank W. Hunger, Assistant Attorney General.

## OPINION

BASKIR, Judge.

### Summary

This case involves the claim of the American Renovation & Construction Company, Inc., (ARC) for Eichleay damages stemming from the 16 months' delay in performing a contract for roof repair at the Naval Air Station in Jacksonville, Florida (NAS JAX). ARC claims the specifications for the new roof were proprietary and that the Navy improperly refused to accept its substitute submittals. The matter is before the Court on the government's motion for summary judgment.

Even assuming that the specifications were proprietary and that the Navy breached some duty to ARC, which we doubt, in any event ARC has not shown injury. We therefore find for the government.

### Discussion

#### Proprietary Specifications

According to the Federal Acquisition Regulations (FARs) and case law, a "proprietary specification" is one identified by brand name, or by details that describe a particular brand name product. FAR 6.302(b)(1)(ii). In ordinary government procurement, that means a product made by only one manufacturer. Government policy discourages use of proprietary specifications because by definition it inhibits competition. 10 U.S.C. § 2304 and 41 U.S.C. § 253. In order to include a proprietary specification in an RFP, the contracting agency must provide a justification and obtain approval (so-called "J and A") from higher authority. FAR 6.302–1(c). The use of an unapproved proprietary specification can be offset if the contracting agency permits the contractor to use an equivalent product, referred to as an "or equal" product. Here the parties dispute whether the specifications were proprietary, and whether the alternatives offered by ARC were "or equal."

#### The Roof Specifications

■ The case has its origins in 1992 when Navy authorities decided it was time to renovate three warehouses at NAS JAX—designated Buildings 162, 163 and 164. It commissioned Mr. John Parks Ill, an independent architect/engineer, to write the specifications for the roof repairs on Building 163, leaving the other two for later. Mr. Parks relied on guide specifications, research and his own preferences and experience. As Mr. Parks testified, he also relied on data from a particular manufacturer, Siplast, Inc. (Siplast):

Q. Do you recall what proprietary names you used?

A. Siplast and M.B. Technology and possibly Suprema.

Q. And you used that in the specification?

A. Yes.

For the roof material, he called for an "aluminum foil faced modified bitumen styrene butadiene (SBS) cap sheet."

In June 1992, Mr. Parks informed the Navy that two manufacturers could provide the roofing material, Siplast and M.B. Technology. On the basis of Mr. Parks' letter, the Navy apparently decided—wrongly—that the specifications were not proprietary because there was more than one available supplier. We say wrongly because all the participants and counsel in this matter have

overlooked FAR 6.302(b)(1)(ii) which states that a specification is proprietary for the Department of Defense if it is only available from "a limited number of suppliers." Two is undoubtedly a limited number of suppliers.

In April of 1993, a protest by Eagle Supply, Inc. (Eagle), to the NAS JAX project manager alerted Mr. Parks that the specifications might nonetheless be proprietary (under the one-source rule), and so he inquired of the three manufacturers known to produce the SBS material—Soprema, M.B. Technology and Siplast. Soprema said it was not in the U.S. market. M.B. Technology said that the tests referred to in the specifications were Siplast tests and could be interpreted as proprietary. Indeed, Siplast subsequently informed the Navy that Veral, a Siplast product, was the only membrane that carried the required fire rating. We cannot tell on what basis Eagle's protest was rejected, but the three responses compel the conclusion that the specifications were arguably proprietary under the one-source rule. Under the Department of Defense test, with only Siplast and M.B. Technology available as suppliers, the specifications were clearly proprietary.

Despite the comments from Soprema, M.B. Technology and Siplast, there was no J and A. The contract was bid and R.F. Lusa & Sons Sheetmetal, Inc. ("LUSA") won, using Siplast as its supplier. Mr. Parks subsequently grew impatient with the unanticipated time and expense involved in his work for the Navy. Mr. Stephen Zavoyski, a Navy civilian architect at the Navy Public Works Center, replaced him, taking responsibility for Buildings 162 and 164, as well as Building 163. However, we shall hear more from Mr. Parks.

In May 1994, the State of Florida Historical Society (SHS) intervened. They considered the World War II-era warehouses worthy of preservation and wished the finished appearance of the roofs to be bronze. Mr. Zavoyski then asked Siplast for suggestions on how to color the aluminum roof. Siplast made two suggestions, Mr. Zavoyski chose one, and the SHS was satisfied. The specifications for the roof on Building 163 now called for SBS "with factory applied fluorocarbon color coating on continuous aluminum sheeting." This raised the costs and LUSA asked for an additional $100,000. The NAS got permission to expend the higher amount.

If the uncolored aluminum SBS roof raised the question of whether the specifications were proprietary, the Siplast-suggested coloring process certainly did even more. The Navy recognized this issue, but never followed up. As the minutes from a Navy meeting on June 8, 1994, state:

> NPWC would contact Siplast to get material specs, samples, and verify that the Veral Spectra Series Medium Bronze was not a proprietary roofing material and that other manufacturers could meet the specification. If the roofing material is proprietary then another meeting would be required with the attendees and the proposed design schedule noted below would be in jeopardy.

No follow-up inquiry was made and no follow-up meeting was held. Instead, Mr. Zavoyski wrote the specifications for Buildings 162 and 164 using a diskette supplied by Siplast and relying on the approved specifications for Building 163.

Mr. Parks was offended at the meddling of the historical preservationists and he was not shy about telling the Navy, Siplast and his Member of Congress about it. He protested that SHS had interfered with his work and run up the costs of the roof renovation. He protested loudly, among other things claiming that with the Siplast-applied coloring there was no question the specifications now were proprietary, even under the one-source definition. The Navy, however, still took no further action on the issue.

One can hardly avoid concluding that the specifications were proprietary for Siplast alone, and the Navy know or should have known this. Indeed, when an inquiry was eventually made, it was discovered that no one in the United States, not even Siplast, could provide a made in U.S. factory-fused fluorocarbon bronze coloring to the aluminum/SBS roof, as strictly required by the contract. Siplast's factory coloring was done in France, not the United States.

Thus the Navy was under obligation to inform ARC and the other bidders for the

Building 162 and 164 contract that the specifications were proprietary and to secure a J and A. It probably would have been unnecessary to inform LUSA, the next lowest bidder; it and its Siplast supplier already know the specifications were proprietary from the Building 163 contract.

The proprietary nature of the specifications was further confirmed by a protest filed by LUSA once it became apparent that ARC was the low bidder. LUSA claimed ARC was disqualified because it was not an authorized applicator of Siplast. On October 3, 1994, the Navy rejected this protest, asserting that the question of applicator qualification was one of contract administration. We quote:

> The Qualifications of Applicator paragraph is a contract administration requirement and, as such, is not protestable. The successful contractor will be required to fully comply with all contractual requirements regarding material specifications.

The Navy implicitly recognized that Siplast was the only manufacturer that met the specifications, and was putting off to another day the question of whether ARC could apply that Siplast material.

The accumulating evidence could no longer be ignored. On January 19, 1995, Mr. Stan Kinmonth, the officer in charge of construction at the Jacksonville Naval facilities, sent an internal letter to Mr. Bill Woodard, of the Naval Facilities Engineering Command, asking for an unbiased view as to whether the specifications were proprietary:

> There have been comments (verbal) that the spec for the roofing is proprietary, that only Siplast can satisfy the contract requirements. Specifically, the # 2 bidder utilized Siplast in his price. The A/E admits that, to his knowledge, only Siplast satisfies the requirement for a factory applied paint applied to the top ply. It gets worse; the A/E [Mr. Parks] designed for a project to reroof bldg. 163. The successful bidder utilized Siplast ... no problem. But PWC Jax refused that design, since these bldgs. are so similar, so PWC is the A/E of record for this contract.

Mr. Ron Haynes, of the Naval Facilities Engineering Command, responded to Mr. Kin-

month that the "subject spec does appear proprietary as it relates to the dark bronze 'Flourcarbon' coated metal foil facing on the modified bitumen cap sheet."

Despite all this evidence, the Navy argues that the specifications were not proprietary because in December of 1995, M.B. Technology, the other SBS source, did finally find a company in Milan, Italy, Alumix SPA, that was able to factory-coat M.B. Technology's material in accordance with the specifications. The Navy approved this proposal on February 11, 1996, more than 16 months after the contract was awarded.

The Court finds the Navy's argument disingenuous. That ARC's subcontractor finally found a supplier to factory-coat its SBS roofing material does not mean the specifications were not proprietary. It took M.B. Technology, a sophisticated company with a significant financial interest at stake, almost a year and half to locate this foreign manufacturer. As it happened, M.B. Technology only came upon the Italian company through a happenstance recommendation from another supplier. The fact remains that the Navy admittedly knew the roof specifications were proprietary to Siplast at least when the final specifications for Building 163 were settled. That there existed a foreign source unknown to the Navy and to the industry does not relieve the Navy of this obvious conclusion.

Under certain circumstances-not present here-a bidder may be charged with exercising reasonable care in investigating whether the contract it bids on contains a proprietary specification. Ordinarily, a contractor can be expected to know his business and his industry better than the government. In the absence of such an inquiry and an appropriate complaint, it may not be heard to complain later. *R.D. Lowman General Contractor, Inc.*, ASBCA No. 36961, 91–1 BCA ¶ 23,456, 1990 WL 224039.

But such an obligation cannot not extend to a world-wide search, nor does it serve here to shift from the Navy to ARC the onus for employing an unauthorized proprietary specification. ARC was more than diligent and its search was unreasonably thorough.

*ARC's Knowledge*

■ The determination that the specifications indeed were proprietary does not end our inquiry. The courts and boards that have examined our issue have only awarded damages for unapproved proprietary specifications when the government knew the specifications were proprietary and the contractor did not. Compare *American Elec. Cont. Corp. v. United States*, 217 Ct.Cl. 338, 579 F.2d 602 (1978); and *Arnold M. Diamond, Inc.*, ASBCA No. 22733, 78–2 BCA ¶ 13447, 1978 WL 2401; with *Helene Curtis Indus., Inc. v. United States*, 160 Ct.Cl. 437, 312 F.2d 774 (1963). In our case, ARC was aware of the proprietary nature of the roof specifications before the contract was awarded. On September 27, 1994, ARC wrote to the Navy to this effect:

> The material spec'ed in the solicitation documents is produced by only three (3) companies in the United States. Only one manufacturer (Siplast) meets the general requirement that companies representing materials used must have been manufacturing the product for five (5) years in the United States. Setting such a restrictive guideline ostensibly makes Siplast a proprietary produc[t] and thus, as such, does not allow for "full and open competition" as called for in the FAR clauses.

ARC could have challenged the Navy's specifications by filing a formal protest. *Gibbs Construction Company*, ASBCA No. 44,141, 95–1 BCA ¶ 27,368, 1994 WL 704659. It did not do so. Instead, it accepted the award when informed by the Navy on September 30, 1994. Thus, when the contract was bid, both parties knew of the proprietary nature of the roofing requirements.

*ARC's Submittals*

■ Where a contractor shows that specifications are proprietary, it may under certain circumstances substitute a functional equivalent—an "or equal" material. *Manning Electric & Repair Co., Inc. v. United States*, 22 Cl.Ct. 240, 245 (1991).

■ ARC's contract contained a "Material and Workmanship Clause." This clause provides that references to brand names in specifications establish only a standard of quality,

and that substitute goods may satisfy contract requirements if equal to the identified item. Where only one product or type of material could literally meet the specifications, the contractor can rely on the material and workmanship clause to support the use of a substitute. *Manning Electric*, 22 Cl.Ct. at 244–45. The second area of disagreement between the parties concerns ARC's efforts to provide an "or equal" substitute. This it failed to do.

■ When a contractor proposes to substitute an item for an identified product or material, it must show (1) that the specification is proprietary; (2) that it submitted an equal substitute; (3) and that the substitute is the functional equivalent or of the same standard of quality. *Manning*, 22 Cl.Ct. at 245. A Contracting Officer's decision to reject materials as not compliant with specifications will be upheld unless it was arbitrary and capricious. *Id.* Procurement officials are familiar with the particular conditions under which equipment has to be used and are in the best position to know the government's actual needs. *See generally* W. Noel Keyes, Government Contracts Under the Federal Acquisition Regulation (2nd 1996), 14.13.

■ The Navy rejected ARC's proffered substitutes for two reasons: lack of a Class A UL fire-rating and inadequate substitute for the SBS modified bitumen material.

i. *Fire Rating*

The contract required that for fire safety the "complete roof covering assembly shall … [h]ave ASTM E 108 Class 1A or UL 790, Class A classification." A fire rating refers to the amount of time a material can withstand fire. Government contracts frequently require fire ratings to insure safety standards are met. *See e.g. Wilner v. United States*, 37 Cont.Cas.Fed (CCH) P 76,101, 23 Cl.Ct. 241 (1991).

On March 27, 1995, and June 7,1995, ARC submitted proposed roofing materials which had a UL Class A fire rating for 70% of the roofing surface. ARC argues that this was sufficient. However, a purchaser is entitled to insist on safety standards for which it has

explicitly contracted. The Navy was not arbitrary and capricious in its refusal. On February 11, 1996, ARC finally submitted a proposed material which did have a 100% Class A fire rating and the Navy promptly accepted it.

### ii. *SBS Equivalent*

ARC repeatedly proposed "atactic polypropylene" (APP), a Polyglass material, as the functional equivalent of the contractually required SBS material. ARC submitted the Polyglass APP material on September 27, 1994 (just before the contract was awarded), March 27, 1995, June 7, 1995, and February 26, 1996, respectively. The first Polyglass submittal was rejected on September 28, 1994, although ARC assets it was not informed of this until October 3, 1994, just after it won the contract. Each of the other offers was rejected in turn.

ARC cites to the testimony of Mr. Parks and Mr. Behbehani, Vice President of M.B. Technology, its subcontractor, to support the argument that there is no difference between APP and SBS. In fact, Mr. Parks and Mr. Behbehani testified quite the opposite.[1] Mr. Parks, who very deliberately chose SBS for Building 163, testified that APP does not work as well in warm climates, and that SBS is easier to apply and easier to maintain:

SBS is, experience wise, working in this climate—in most cases, working in this climate much better than the APP is working.

\* \* \*

Representation [for SBS] is readily available. And one thing you need in any roofing—commercial roofing application is good technical backup and assistance for construction reviews during the construction from the manufacturers.... APP is available but not being used as much in this area of the country as SBS is. Sometimes the technical assistance is a little bit more skimpy.

And there are other characteristics of the [SBS] product, such as pliability of the product, the elongation of the product—what the modification of the asphalt ends up doing is giving the—giving the project—the product some elasticity so that it doesn't get rigid and stay rigid like the top of this conference table. It has some movability.

Mr. Behbehani testified that APP, in contrast to SBS, is only torch-applied and is less flexible, and therefore allows less roof movement and less temperature fluctuation. It is also more brittle:

APP is only torch-applied. SBS is more elastomeric than APP.

\* \* \*

SBS is a rubber-based product. APP is a plastic-based product. So being rubber-based it exhibits rubber characteristics more than a plastic product.

ARC, nevertheless, asserts that any differences in functional equivalency were waived by virtue of a Polyglass submittal ARC sent the Navy before the Navy awarded ARC the contract. However, whether this argument has any merit or not, after the award of the contract and in response to the Navy's rejection of its Polyglass submittal, ARC wrote:

Finally, as per the guidelines set forth in your letter of September 28, 1994 (of which I received a FAX copy today), *AMERICAN RENOVATION & CONSTRUCTION COMPANY* will abide by the specification as written.

ARC, after the submittal was rejected and with the view that the specifications were proprietary, still registered its intent to comply with the contract it had just been awarded.

### *The Value Engineering Change Proposal ("VECP")*

ARC, in its opposition to the government's motion for summary judgment, alleged for the first time that the Navy improperly re-

---

1. Citing evidence which in fact stands for exactly the opposite of the proposition is either careless or foolhardy, but in either case qualifies for the Court of Federal Claims' Chutzpah Championship. *See* Guggenheim, *The Evolution of Chutzpah as a Legal Term: The Chutzpah Championship; Chutzpah Award, Chutzpah Doctrine; and Now, the Supreme Court,* 87 Ky.L.J. 417.

jected its VECPs for a HPG/Trocal roofing system. ARC's late claim, not having been stated in its complaint, is subject to a procedural objection. While this defect might be curable under USCFC Rule 15(a), it also presents a more serious, incurable defect, that of jurisdiction.

▮ The United States "is immune from suit save as it consents to be sued … and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Sherwood,* 312 U.S. 584, 586, 61 S.Ct. 767, 770, 85 L.Ed. 1058 (1941) (citations omitted). The Court of Federal Claims has jurisdiction "only of those [claims] which by the terms of some act of Congress are committed to it." *Hercules, Inc. v. United States,* 516 U.S. 417, 422–23, 116 S.Ct. 981, 985, 134 L.Ed.2d 47 (citing *Thurston v. United States,* 232 U.S. 469, 476, 34 S.Ct. 394, 58 L.Ed. 688 (1914)). The Contract Disputes Act (CDA) grants the court jurisdiction over actions brought on claims within twelve months of a contracting officer's final decision. 41 U.S.C. § 609(a) (1994). Thus, for the court to have jurisdiction under the CDA, there must be both a valid claim, and a contracting officer's final decision on that claim. The claim, to be valid, must give the contracting officer sufficient notice of the amount and the basis for a decision. *Contract Cleaning Maintenance, Inc. v. United States,* 811 F.2d 586, 592 (Fed.Cir.1987).

▮ In *Santa Fe Engineers, Inc. v. United States,* 818 F.2d 856 (Fed.Cir.1987), the plaintiff appealed the Board of Contract Appeals dismissal of its claim for lack of jurisdiction under the CDA. The plaintiff had certified and submitted a claim to the contracting officer for a final decision and, increased the basis and amount of the claim. *Id.* at 859–60. Specifically, in proceedings on the merits, the plaintiff asserted additional delay and impact costs arising "from the collective nature of all the problems, changes and directives that were issued on the project." *Id.* On appeal, the Federal Circuit characterized the plaintiff's change as an "addition of a claim … entirely new [which] had never been presented to the contracting officer, or certified to him." The claim ad-

dressed change orders and design difficulties unrelated to the original three change orders. *Id.* Because this new claim had not been certified and submitted to the contracting officer, the court held it was not properly within the Board's jurisdiction. *Id.* at 860.

In determining whether the assertion constitutes a new claim, the critical test is whether the contracting officer's right to adjudicate the claims is undermined by circumventing his statutory role "to receive and pass judgment on the contractor's entire claim." *Cerberonics, Inc. v. United States,* 13 Cl.Ct. 415, 418 (1987). In the absence of the submission of a claim to the contracting officer and the contracting officer's final decision on the claim, the Court of Federal Claims lacks jurisdiction. *Rig Masters, Inc. v. U.S.,* 42 Fed.Cl. 369 (1998).

The claim ARC submitted to the contracting officer did not refer to VECP's, nor did it allude to them in a manner which would have alerted the contracting officer that they were involved in the claim. Instead, the claim focused its exclusive attention on the Navy's rejection of the materials submittal. As the opening paragraph of the July 1, 1996, claim states:

> This letter forwards a request for a Contracting Officer's final decision for the delays and resultant damages incurred by AMERICAN RENOVATION & CONSTRUCTION COMPANY (ARCC). *The delays and damages occurred as a result of the failure of the Navy to timely approve our firms's submittal (No. 011) concerning the material to be utilized in the roofs on the subject project.* (Emphasis added).

ARC has added a new claim not asserted in its claim to the contracting officer. The Court does not have jurisdiction over it.

*Duty of Good Faith*

ARC asserts the Navy's behavior in using proprietary specifications, enforcing them, and refusing to reveal that the specifications were proprietary, constituted a breach of the duty of good faith, and as such is a basis for liability. A party alleging a breach of the duty of good faith by the government must meet a high standard of proof. *Kalvar Corp.*

*v. United States,* 211 Ct.Cl. 192, 543 F.2d 1298, *cert. denied,* 434 U.S. 830, 98 S.Ct. 112, 54 L.Ed.2d 89 (1977).

The record is clear that the Navy was in continual contact with Siplast from before the contract was awarded, and even before the specifications were written, at least until September 29, 1995. Siplast recommended the color-coating system and provided details for the specifications on Buildings 162 and 164. It also regularly advised the Navy on the inadequacies of ARC's submittals. This was certainly unwise and may very well have been improper. Siplast wanted its product used and, indeed, it wanted its principal, LUSA, to perform the work on Buildings 162 and 164, as well as 163. Nonetheless, the fact that the Navy received advice from Siplast regarding ARC's submittals does not constitute a breach of good faith. ARC has failed to show that the Navy improperly rejected the submittals. They were clearly not the functional equivalent of the specified product. The Navy did not need Siplast to point this out.

The Navy might have wanted a product that only Siplast in fact made, but ARC has demonstrated no evidence to support its implication that the Navy, in breach of good faith, was determined to have Siplast material regardless of the feasibility of other materials. ARC's implication is undermined by the fact that the Navy promptly accepted a non-Siplast material when it met all the contractual requirements.

### Damages

Our review thus far has failed to reveal a legal duty owed to ARC, but breached by the Navy. It is true that the Navy used a proprietary specification without necessary approval, but it is also true that ARC was fully aware of this when it accepted the contract award. Moreover, the Navy properly rejected the APP submittals. Still, it did take ARC some 16 months to find a supplier that could satisfy the specifications.

ARC seeks damages as a consequence of the Navy's use of the proprietary specifications and the delay in meeting them. In its motion for summary judgment, the government takes aim at ARC's theory of recovery.

ARC replies that the damages stated in its complaint were an estimate, and that the complaint indicated its intent to prove its damages at trial. While at this summary judgment stage ARC would not be required to establish with conclusiveness the exact dollar amount of those damages, it must at least present a prima facie case of injury. Put another way, ARC must show it was actually hurt by the delay. We confess to some difficulty in determining what its theory of damages is. We will trace ARC's articulation of its recovery theories from the claim submitted to the contracting officer through to oral argument.

In its May 9, 1996, request for equitable adjustment, which was subsequently incorporated into its claim to the contracting officer, ARC stated:

> The delay associated with this issue has delayed ARC for approximately 385 days. The prorated home and field office overhead total approximately $1,141 per day. The increased cost to ARC to utilize the MBT product totals $67,883.50.

We understand this to be a claim both for allocated overhead, so-called Eichleay damages (*Eichleay Corp.,* ASBCA No. 5183, 60–2 BCA ¶ 2688, 1960 WL 538 (1960), *aff'd on recon.,* 61–1 BCA ¶ 2894, 1960 WL 684 (1961)), and for the difference in cost between the M.B. Technology roof and the Polyglass roof ARC wished to use.

In its Complaint, ARC phrased its claim somewhat differently:

> As a direct and proximate result of the foregoing, ARC has suffered damages as and for delay, disruption, inefficiency, impact and extended home and field office overhead in the approximate sum of Eight Hundred Thirty Six Thousand, Four Hundred and Twelve Dollars ($836,412.00) and a three hundred sixty five (365) day time extension.

This maintained the Eichleay claim. But it did not, however, include the claim for the increased cost of the M.B. Technology roof. This claim, then, was apparently abandoned. Moreover, ARC would have many obstacles to overcome to establish its entitlement. First, ARC was on notice that Polyglass was

not an adequate substitute at the time of its bid. Second, the Polyglass submittals were properly rejected on a number of grounds. Lastly, the proprietary specifications had to do with factory color-coating, not with the SBS composition which was lacking in Polyglass.

■■ To recover unabsorbed overhead, ARC must show that it was on standby, required to resume work at a moment's notice, and thus was unable to take on other work. *Interstate Gen. Gov't Contractors, Inc. v. West,* 12 F.3d 1053 (Fed.Cir.1993), *C.B.C. Enterprises, Inc. v. United States,* 24 Cl.Ct. 187 (1991), *aff'd,* 978 F.2d 669 (Fed. Cir.1992). A contractor is on standby only when work is suspended for a period of uncertain duration and the contractor can at any time be required to return to work. *West v. All State Boiler, Inc.,* 146 F.3d 1368 (Fed.Cir.1998).

■■ During the briefing of the summary judgment motions, the government pointed to a fatal defect in ARC's case—it was never on standby. While the order to proceed with the contract work was issued November 11, 1994, the contract required that all submittals be approved before any of the work could begin. Thus, ARC could not be on standby until it submitted a material which met the requirements of the specifications. Its submittal was not approved until February 11, 1996.

After the government's brief argued that ARC had not been on standby, ARC's response did not directly defend its Eichleay claim, and appeared to concede the issue:

> Defendant does not state what proposed finding of fact is relied upon to establish the conclusion that PLAINTIFF was not on standby. *Assuming the Court held that PLAINTIFF was not on standby* during the period September 30, 1994 to May 6, 1996, when PLAINTIFF was finally allowed to commence demolition *there are still other damages* attributable to the sole source specification including the approximately $625,000.00 in liquidating damages

presently being withheld by the NAVY. (Emphasis added)

Finally, during argument, counsel stated:

> But, what I heard is, cause we mitigated our damages, we shouldn't get standby costs. But, if I would have had people out there working or doing something, then I would have got somehow standby costs.

> \* \* \*

> The term labor, the contractor never has labor standing by, standing on shovels on standby. That would not be mitigating damage.... If I would have hired laborers, I could—I would not have reasonably asked for compensation for those laborers.

ARC's counsel then stated that ARC's management team spent an extra 300 days on the contract premises. However, when the Court asked counsel if "they just sat around," ARC's counsel responded: "No, they were working on other contracts."

We conclude that both in its failure to show it was on standby and in its apparent concession of this point, ARC has not established its right to Eichleay damages, much less its attempt to offer a "modified" Eichleay formula. *Interstate Gen. Gov't Contractors, Inc.* Both the prayers for relief contained in its claim to the contracting officer have come to nought.

Since the Court's jurisdiction in CDA cases is defined by the dimensions of the claim submitted to the contracting officer, any prayer for relief not encompassed within the May 9, 1996, claim is beyond our ken. *Santa Fe Engineers, Inc.,* 818 F.2d at 860. For the sake of completeness, and because the matter may become significant hereafter, we will continue our review of ARC's damage assertions.

The May 1996 claims were replaced by the two quite different and new claims in ARC's response to the government's motion for summary judgment as we have quoted, "$625,000 in liquidated damages" withheld by the Navy, and the "still other damages." If there are "other damages," it is long past time for the plaintiff to say what they might be. (They might be those newly asserted in Count II of ARC's motion to amend its com-

plaint filed on September 10, 1999, and still pending as of this writing.) The mention in the brief of the $625,000 item was the first time the Court saw such a reference. It was not in the claim to the contracting officer nor was it in the complaint. Moreover, during argument neither counsel was able to shed any light on this supposed penalty. It is, therefore, not before us. However, we take this opportunity to observe it would be quite brazen for the Navy to send ARC on a world-wide scavenger hunt and then penalize it for taking too long to find the secret ingredient.

As we said, it is unclear that ARC actually suffered any recoverable expenses during the period from contract award to the February 1996 approval. ARC points to limited daily project site reports to show damages, but these related to its work on other contracts at the Jacksonville Naval facility. None of it related exclusively to this contract. ARC has not shown it was harmed, or that it was somehow penalized by the Navy. *Wilner v. United States*, 24 F.3d 1397 (Fed.Cir.1994) (en banc) (for delay damages contractor must show that the government-caused delay actually harmed the contractor).

## Conclusion

For these reasons, we grant the government's Motion for Summary Judgment.

IT IS SO ORDERED.

## ORDER

The American Renovation & Construction Company, Inc., (ARC) has filed a motion to reconsider the Court's opinion and order, issued September 22, 1999, granting the government's Motion for Summary Judgment. **ARC's motion is hereby DENIED.**

■■■■ The decision to grant a motion for reconsideration is left to the sound discretion of the court. *Yuba Natural Resources, Inc. v. United States*, 904 F.2d 1577, 1583 (Fed.Cir.1990). To prevail on a motion for reconsideration, the movant must point to a manifest, i.e., clearly apparent or obvious, error of law or a mistake of fact. *Principal Mutual Life Ins. Co. v. United States*, 29 Fed.Cl. 157, 164 (1993). A court, therefore, will not grant a motion for reconsideration if

the movant "merely reasserts . . . arguments previously made . . . all of which were carefully considered by the [trial c]ourt." *Id.* (quoting *Frito–Lay of Puerto Rico v. Canas*, 92 F.R.D. 384, 390 (D.P.R.1981)).

■■■■ ARC has merely reasserted the arguments previously made before this Court. Indeed, it appears most of its motion consists of previously submitted text literally cut and pasted for use here. Each of these arguments was addressed in the Court's earlier decision. The Court will nonetheless briefly address the issues raised in the motion and reiterate its position.

1. *When the contract was bid ARC did not know the proprietary nature of the specification.*

ARC was aware of the proprietary nature of the roof specifications before the contract was awarded, yet failed to file a formal protest. ARC pointed to no evidence which raises a contrary inference. Indeed, the matters it cites reaffirm its knowledge of the ". . . requirements mandating the use of the Zipiast products only for the referenced solicitation."

2. *ARC conditioned its bid for the use of the Polyglass product.*

After the submittal was rejected and asserting that the specifications were proprietary, ARC nonetheless registered its intent to comply with the contract it had just been awarded:

Finally, as per the guidelines set forth in your letter of September 28, 1994 (of which I received a FAX copy today), *AMERICAN RENOVATION & CONSTRUCTION COMPANY* will abide by the specification as written. ARC letter of October 3, 1994.

3. *ARC did challenge the Navy's specifications.*

If ARC wished to challenge the Navy's specifications as proprietary, it should have made a formal protest. It did not.

4. *There is evidence that the fire rating was waived by the Navy when it awarded the contract or at least the Navy knew the product ARC bid on was not Class A fire rated over the entire slope of the building.*

ARC argued previously that the Class A fire requirement was added by the original designer, and that the Navy did not require the designer to specify a Class A system. Regardless of how the requirement came to be, it was a part of the solicitation and the contract. The government is entitled to insist on safety standards for which it has explicitly contracted. The Navy was not arbitrary and capricious in its refusal to change the requirement.

ARC also argued that the pre-contract Polyglass submittal indicated the limited fire rating it intended to supply. We repeat: When ARC accepted the contract it accepted the specifications, including the fire rating specification.

5. *SBS and APP are equivalent products*

The contract called for an "aluminum foil faced modified bitumen styrene butadiene (SBS) cap sheet." ARC failed to present a genuine dispute that APP is the functional equivalent of the contractually required SBS. The transcript testimony ARC points to in its motion does not raise any inference to the contrary. It merely suggests that both products are widely used, and both products can be torch applied. It does not state that they are functional equivalents. Other parts of these same transcripts cited by the Court clearly state that SBS is in a number of ways a superior product to APP.

6. *ARC's VECP submittal is not a claim but a fact that supports ARC's position that the product was equal.*

We simply do not have jurisdiction over this aspect of ARC's claim, in whatever form ARC wishes to couch it. This assertion was not even raised until ARC responded to the government's motion for summary judgment. While ARC complains that this is form over substance, the Supreme Court has made clear that the Court of Federal Claims has jurisdiction "only of those [claims] which by

the terms of some act of Congress are committed to it." *Hercules, Inc. v. United States,* 516 U.S. 417, 116 S.Ct. 981, 985, 134 L.Ed.2d 47 (citing *Thurston v. United States,* 232 U.S. 469, 476, 34 S.Ct. 394, 58 L.Ed. 688 (1914)). The claim ARC submitted did not refer to VECPs, nor did it allude to them in a manner which would have alerted the contracting officer that they were involved in the claim. The Court expresses no opinion on ARC's right to make a claim to the contracting officer based on the VECP rejection.

7. *The Navy clearly breached its obligation of good faith and fair dealing.*

ARC repeats the Court's finding that the specifications were in fact proprietary. This much is correct. The Navy was wrong to employ a proprietary specification. But given ARC's prior knowledge, there was no breach of good faith and fair dealing.

8. *Eichleay damages are composed solely of unabsorbed home office overhead and have nothing to do with field office overhead and the additional direct costs to utilize the MBTech product*

ARC did not establish even a prima facie case of injury. It was not on standby as required to recover Eichleay damages. Its other damage claims were either abandoned, unproved, or not presented in its initial claim.

### Conclusion

ARC has presented no evidence or reasonable inferences from the evidence which raise a genuine factual dispute. As such, summary judgment in favor of the government was appropriate. ARC's motion for reconsideration has failed to point to a manifest error of law, or a mistake of fact, or a material factual dispute.

IT IS SO ORDERED.